# PACIFIC MAIL STEAMSHIP COMPANY *vs.* THE PACIFIC.

## October 29, 1909.

*Negative proposition—Burden of proof:* Under the pleadings it became necessary to the case for libelant to prove the negative proposition that a cable attached to a buoy was not removed by the libellee, and, being without information, and the claimant from the nature of the case being in possession of full information on the subject, it was *held* that the burden of proof was on the claimant to disprove the proposition.

*Weight of testimony—Diagram:* A diagram drawn by a witness to illustrate his testimony is entitled to more weight, other things being equal, than a diagram by counsel and accepted by a witness.

*Negligence from sunken cable—Liability:* One placing cables at or near the bottom of waters used for navigation, so that they obstruct navigation, is liable for such damages as may arise thereby to vessels navigating such waters.

*Contributory negligence—Responsibility of libelant:* If the libelant, by his negligence, increased the amount of injury he received, the libellee cannot be held liable for such additional injury, although responsible for the injuries resulting from the first accident.

*Apportionment—Contributory negligence:* Where the injury caused by libelant's negligence can be separated from that caused by libellee, apportionment must be made and the libellee held liable only for the portion of the total injury caused by its negligence.

*Same:* Where, in the case of contributory negligence, the proportion of damages caused thereby can be definitely ascertained, and is more or less than one-half of the total damages,—in this case less,—the decree should be in accordance therewith instead of following the general rule of admiralty in such cases of relieving the libellee of one-half of the damages.

In *Admiralty* : Libel *in rem* for damages for injuries to the Steamship Siberia.

*Kinney, McClanahan & Cooper,* Proctors for Libelant.

*Nathan H. Frank, E. M. Watson,* and *Holmes, Stanley & Olson,* Proctors for the Claimant.

Dole, J.   The Pacific Mail Steamship Company, a corporation, brought this libel against the Pacific,—described as an ocean-going steam dredge, an American vessel of about eight hundred tons gross burden, and complains substantially as follows:

That on the 10th day of November, 1905, "the libelant's steamship ' Siberia,' a twin screw American vessel of about twelve thousand tons gross burden, in good condition and well manned and provided," was maneuvering with the assistance of a tug boat in the harbor of Honolulu of the Territory of Hawaii preparatory to leaving such harbor under a licensed pilot on its regular voyage to the port of Yokohama and, while so maneuvering, a heavy wire cable and anchor chain lying on or near the bottom of the harbor fouled her starboard propeller, shaft and shaft sleeve in such a way as to endanger and cause her great damage, and that such fouling was not caused or brought on by any carelessness or want of skill or precaution on the part of her officers and pilot; that the Siberia then, because of the difficulty of maneuvering with only one propeller in use in a harbor of the size of the port of Honolulu and the shallowness of the water therein, and of the danger of anchoring in the condition she was in for the same reason, and because of her size and the depth of water she was drawing, proceeded with one propeller out of the harbor to deep water outside, where she anchored; that she promptly obtained the services of a diver who succeeded in removing the anchor chain from the propeller and its shaft and disconnecting it from the wire cable to which it was attached, but found it impossible, under the circumstances, to unwind or remove the wire cable

from the shaft and sleeve, so that, after a delay of more than seven hours, the master decided to proceed on the voyage, leaving such wire cable around her shaft and sleeve; that, having arrived at the port of Yokohama on the 21st day of November, she employed divers to remove the said wire cable from the shaft and sleeve, which operation consumed three days and one night; that upon the arrival of the said vessel on its return voyage in the port of San Francisco about the 12th day of January, 1906, she was placed in dry dock and surveyed and upon the examination by the surveyors it was found necessary to remove the starboard propeller and propeller hub and to draw her starboard tail shaft in order to ascertain and repair the damage done thereto and to the vessel by the said wire cable and anchor chain; that the necessary repairs were thereupon made; which docking, surveying and repairs consumed four days and four nights, amended to five days and four nights; that by such delay she was hindered in the prosecution of her business as a common carrier and delayed in starting on her next regular voyage; that all things done in the premises by the libelant and its officers, agents and employes were necessarily done in the proper and reasonable exercise of due precaution, skill and seamanship; that the wire cable and anchor chain which fouled her propeller as aforesaid was used by the libellee while engaged in dredging operations within the harbor of Honolulu, the said anchor chain being attached to a government buoy located in the said harbor, and that the said wire cable was fastened to such anchor chain and, so fastened, was used by the libellee in its work of dredging as aforesaid, by means of which the position of the libellee was shifted from one point to another; that a few days prior to the said 10th day of November, the libellee changed her working position and in so doing she cast off the said wire cable fastened to the said anchor chain and caused the end of the section of said cable connected with the anchor chain of the said buoy to drop to the bottom of the harbor and lay there until the said 10th day of November "a menace and obstruction to the free navi-

gation thereof"; that on the said 10th day of November, neither the officers and crew of the said steamship Siberia, nor the said pilot knew that the said wire cable was lying on the bottom of the said harbor, and there was no "mark of identification or warning attached" thereto; and the said wire cable was not lawfully within the lines of the said harbor; with allegations charging gross and culpable negligence and carelessness on the part of the libellee, her officers, crew, agents, servants and employes, and the absence of contributory negligence on the part of the libelant; and further alleging that the value of the said Siberia on the said 10th day of November was approximately two million dollars and the value of her cargo approximately one million dollars, and that the value of the libellee and her machinery and equipment was one hundred thousand dollars; and asking for damages for the injuries and expenses, delays, etc., caused as aforesaid to the said Siberia by such fouling, in the sum of thirty thousand dollars.

The answer, as amended, denies "that the wire cable used by it . . . . or any other wire cable whatsoever belonging to or used by said dredge is the one which, with the anchor chain attached, fouled the said steamship Siberia's starboard propeller, shaft and shaft sleeve as in said libel alleged or otherwise or at all fouled said steamship Siberia's starboard propeller, shaft and shaft sleeve," and admits that while engaged in dredging in the said harbor of Honolulu, at a place adjacent to the Marine Railway, immediately prior to the 10th day of November, 1905, she caused a large wire cable connected with her immediate rigging and machinery to be fastened to the anchor chain of a government buoy located on the opposite side of the harbor channel from where she was then operating, for use in her work of dredging, which cable consisted of two or more separate sections securely shackled so as to make one continuous line to the said buoy; and, by Article 15 of the amended answer, "that it temporarily caused the end of the section of said cable immediately connected with the said anchor chain of said buoy to drop to the bottom of said harbor, but alleges

that the same was taken up and removed from said position and taken on board of said dredge before the said 10th day of November, 1905"; and generally and specifically denies all carelessness or negligence on the part of the officers and crew of the libellee.

The main issue of fact in this case is the question whether the wire cable which, attached to the chain of a buoy in the harbor, fouled the starboard propeller of the Siberia, was the property of the claimant or in use by the libellee. If the court should find that such cable was not the property of the claimant, or a cable used by the libellee, that would dispose of the case in favor of the libellee.

A preliminary question comes up in relation to this issue. It is alleged in Articles 13, 14 and 15 of the libel that the libellee, having been operating in the vicinity of the Marine Railway "for a few days immediately prior to said 10th day of November, 1905," and being then connected with the anchor chain of the buoy in question by wire cable, she changed her working locality to a point toward the harbor entrance, but before doing so, cast off the said wire cable and "caused the end of the section of said cable immediately connected with said anchor chain of said buoy to drop to the bottom of said harbor, where it lay on said 10th day of November, A. D. 1905, a menace and obstruction to the free navigation thereof." The claimant, in Article 15 of the amended answer, admits that at the time alleged in the libel, the dredge "temporarily caused the end of the section of the said cable immediately connected with said anchor chain of said buoy to drop to the bottom of the said harbor but alleges that the same was taken up and removed from said position  .  .  .  before the said 10th day of November, 1905."

From these pleadings there develops the negative proposition that the libellee did not remove such cable from the bottom of the harbor and the chain of the buoy before the 10th day of November, the day of the accident.

The libelant is not in possession of information relating to

the question of the removal of the cable from the buoy which the claimant alleges it placed there and removed therefrom a few days before the fouling of the Siberia's propeller, and claims that the fact that it is not in possession of such information, and the claimant being obviously in possession of all of the information as to the removal of such cable from the buoy, if it was removed, the burden of proof is on the claimant to show that it was removed before the time of the accident.

The claimant, being in full possession of the facts, which are unknown to the libelant, must, according to the rule in such cases, assume the burden of proof, because if the negative proposition advanced by the libelant is not true, the claimant has the information by which it can disprove it, and it is vitally for its interest to do so, if it is the fact that such line was removed before the 10th day of November.

" When the means of proving the fact are equally within the control of each party, then the burden of proof is upon the party averring the negative; but when the opposite party must, from the nature of the case, be in possession of full and plenary proof to disprove the negative averment, then it is manifestly just and reasonable that the party thus in the possession of the proof should be required to adduce it, or upon his failure to do so, we must presume it does not exist, which of itself establishes a negative." *Great Western R. R. Co. v. Bacon,* 30 Ill. 347: 83 Am. Dec. 200; *Hoffschlaeger Co. v. Young Nap,* 2 U. S. Dist. Ct. Haw., 97, 98-99; *Clapp v. Town of Illington,* 87 Hun 524: 34 N. Y. Supp. 283, 285.

At the trial of the case, the buoy to which was attached the wire cable which, with the anchor chain of the buoy, fouled the starboard propeller of the Siberia, was recognized as buoy No. 2; another buoy which was considerably referred to in the testimony, which was anchored close to the light-house and several hundred feet away from buoy No. 2, was recognized as buoy No. 1. They will be referred to in this decision as buoy 2 and buoy 1, respectively.

Considerable testimony was introduced of a circumstantial nature, bearing on the question whether the wire cable which

was attached to buoy 2 and fouled the propeller of the Siberia was the cable of the libellee, which testimony pro and con was aimed to bring out the kind of the cable and the method by which it was attached to buoy 2. It appears from the evidence on both sides that the libellee was accustomed to attach its swinging cables to buoys by means of loops which were thrown over the buoys.

On the defense, the claimant introduced a witness by the name of Harry Spencer, whose evidence was taken by deposition in California. It appears by this deposition that Spencer was an employe of the claimant and during the time the libellee was dredging in the harbor of Honolulu was employed thereon as mate of the libellee (Spencer p. 7) up to and after the time of the accident, and that it was his duty as mate of the dredge to lay out the cable lines from both sides of the dredge (id. p. 8), attaching them to some fixed object to be used for the purpose of swinging the dredge sideways during its work of dredging. This witness states that at the time the line from the dredge was attached to buoy 2, the dredge was working in a position "somewhere between the U. S. Naval Wharf No. 2 and the buoy No. 1" (id. p. 12), and that she had at that time swinging lines on both buoys 1 and 2 and that it was his duty to place such lines (id. p. 12) and also to take them up (id. p. 13), and that he, with men to help him, removed them both (id. p. 16),—the line from buoy 2 before the time of the accident of November 10th and the line attached to buoy 1 after the accident (id. p. 17). Upon cross-examination he stated that he removed the line from buoy 2 one or two days before the accident (id. p. 25). Upon being asked what fixed that time in his mind his answer was "because we needed it (the cable)" (id. p. 26). Upon being pressed to state what made him remember particularly that he removed the line from buoy 2 before the accident, and from buoy 1 after the accident, his only answer was because they needed the wire (id. pp. 37, 40), and in reference to buoy 2 he said the long one from buoy 2, which he described as being three

or four hundred feet long (id. p. 41). It appears from his and Matson's testimony that it was the custom of the dredge, upon changing her position from where she was working to another, to disconnect the swinging wires near the dredge, letting the parts attached to the buoys drop to the bottom of the harbor, buoying the ends with ropes attached to floating pieces of wood in order to conveniently pick them up, and that they would pick them up at an indefinite time afterwards, described by Spencer as two or three days or more (id. pp. 42-43). He was unable to give the names of any of the men who were working with him in removing the lines from buoy 2 and buoy 1 (id. pp. 38, 40), or the day,—either of the week or month, when he removed the lines from either buoy (id. p. 40). On cross-examination he said that the dredge was alongside the light-house when she was using the line attached to buoy 2 (id. p. 41). He was unable to fix the times of the removal of swinging lines which were attached to other fixed objects, as dolphins and piles, his only answer as to the removal of the cable from buoy 2 being that he remembered the removal of the line attached to buoy 2 because they needed the longest wire at that time.

His testimony is the only evidence introduced as to the removal of the swinging line from buoy 2 and therefore becomes of great importance in this case, for, if it is accepted, it decides the case in favor of the libellee. In examining the evidence of Mr. Spencer, we find that he states that on proceeding from the dredge to buoy 2 for the purpose of fixing a line to it, they went out in a boat (id. p. 16); that the depth of the water along which they laid the line was "one foot up to three or four or five, along like that" (id. p. 16). The next question was, "For how many feet?" Answer: "About three or four hundred feet," and that in going there the water was not always deep enough to float the boat; that they had to get out and walk and push the boat along, and this for a distance of three or four hundred feet (id. p. 16). A witness introduced by the libelant, Edward Nelson, who was captain of the dredge dur-

ing the period in question, and whose evidence was taken by deposition in California, stated that they began the use of the wire to buoy 2 on November 5th, and finished in the forenoon of November 6th. (Nelson, pp. 79, 80).

The testimony of J. R. Slattery, the captain of the corps of Engineers of the United States Army who was in charge of the improvements in Honolulu Harbor, and, at the time the work was being done by the dredger Pacific in such harbor, had supervision of that work, was taken by deposition before Federal Commissioner Hatch. In his testimony he referred to reports from November 3rd to November 12th, made by inspectors appointed by him to superintend the dredging operations. Such reports were offered to be introduced in evidence, to be marked Libelant's Exhibits B to I, for the purpose of showing the location of the dredge on each of the days preceding the accident and on the day the accident occurred. These reports were objected to by counsel for the defendant, but it does not appear on the record that such objection was acted upon. The reports referred to (Exhibits B to I) have not been found and the court has therefore been unable to refer to them. The location of the dredge, however, from November 3rd to November 10th is laid down on the map offered by libelant as Libelant's Exhibit 5 and introduced in evidence, by diagrams with appropriate memoranda. By this it appears that the position of the dredge on November 5th during the whole of the day was off the end of the Marine Railway a little to seaward, and that on November 6th, for the whole of the day, the position of the dredge was about half way between the end of the Marine Railway and United States Naval Wharf No. 1, and on November 4th it was operating seaward of the Marine Railway inshore from the position on November 5th. A straight line from either the first or last mentioned positions, one of which would obviously be the position from which the line was taken to buoy 2, and which agrees with Spencer's testimony, to the position of buoy 2, as described by Captains Tripp, Lorenzen and Fuller, persons well acquainted with the

harbor,—and in the case of Captains Tripp and Fuller, harbor masters,—would lie about in line with the bows of the Mokolii pointing toward the town.

The course mentioned by Spencer requiring him to go three or four hundred feet through shallow water would require a course around the stern of the Mokolii,—an indirect course and obviously not the convenient one, as the other course across the bows of the Mokolii is the most direct and is through the deep waters of the harbor. Spencer's evidence on this point is rebutted by the testimony of Monoghan, who operated the launch which towed the pontoon carrying the wires which were laid to buoy 2, and by a number of boys who were playing and bathing around the wharves that day and who went on the launch as visitors and for pleasure. If Spencer's statement of using a boat on that occasion may be construed to mean a row boat in contradistinction from a motor boat, it is also rebutted by the above witnesses.

Captain Nelson testifies that the line from the dredge to the buoy was taken apart and the section attached to buoy 2 dropped,—which corresponds to the allegation of the amended answer, and the other part fastened to an anchor for swinging the dredge, but eventually taken up, as the anchor dragged (Nelson, pp. 90-91), and the line carried to the Kinau wharf (id. p. 91). When the line was taken apart, the section attached to buoy 2 was dropped to the bottom of the harbor. Spencer, in his testimony, makes no reference to this incident narrated by Captain Nelson, but confines his testimony on this point to the one statement that the line,—obviously meaning the whole line with the loop attached, except the end remaining attached to the dredger,—was taken up because they needed it, being a long line. It may be that his memory related to the using of the part of the line which Nelson says was attached to an anchor, as he states they needed the line because it was a longer one for swinging the dredge. Taking Nelson's testimony on this point with Spencer's, it seems probable that the long wire mentioned by Spencer as "needed," was this part

of the swinging wire to buoy 2 which Nelson says they separated from the remaining section attached to buoy 2, and fastened to an anchor as a new swinging line. There is no evidence in the whole case which refers to the removal of the section left attached to the buoy and dropped to the bottom of the harbor, when the line was taken apart,—no evidence showing that that section left attached to the buoy was ever picked up, except Spencer's statement that he removed the line because they needed to use the longer line, and his statement that he took it up himself (p. 17).

There is another matter of testimony going to Spencer's credibility, which I wish to refer to here. He repeatedly states in the most positive manner that he removed the swinging line attached to buoy 1 shortly after the accident, but not the next day (Spencer, pp. 49, 50), and that he, with men under him, pulled it up from the bottom of the harbor and took the loop apart (id. p. 46), and that the loop was a loop made of a wire cable seventy-five to one hundred feet long doubled around and fastened to a long wire, and that that was about the average length of the wire he used in making a loop (id. pp. 39-40). Now we have the evidence of a large number of persons (F. W. Klebahn, Tr. pp. 261-262; C. S. Holloway, Tr. p. 277; Captain Fuller, Tr. p. 283; James Lyle, Tr. pp. 360-361; Wm. Pololu, Tr. p. 299, and Keawe, Tr. pp. 340-341) who went out on the day after the accident to buoy 1 to examine a cable attached to its chain. The buoy had been pulled out of the water by the pile driver by order of Captain Fuller, harbor master, and the chain and part of the wire cable attached to it were on the deck of the pile driver, the rest of the line running into the channel toward the channel wharf and there buoyed by a piece of wood. This line was left in that condition and was removed during the day by someone to the court unknown, and yet Spencer states that he pulled up and removed the line attached to buoy 1 two or three days after the accident, a statement very difficult to accept in view of the above evidence. Moreover the unanimous testimony of all these witnesses who testified on

the subject was that the loop found on buoy 1 was a running noose.

Claimant's counsel have taken the ground in their brief that it is a mere presumption that the wire attached to the chain of buoy 1 was the wire laid there by the libellee. I consider the evidence preponderating in favor of the theory that it was the cable of the libellee. Spencer states that he placed a cable over buoy 1 before the accident and removed it after the accident. When the buoy was raised by the pile driver into the air, a wire cable fastened to its anchor chain came up with it. This cable extended out into the harbor channel toward the channel wharf, or in that general direction, and was buoyed at the end by a rope to a stick of wood, which corresponds to claimant's evidence as to its custom and manner of leaving its swinging lines after using them, and the direction in which the line from buoy 1 was left. If it was not the libellee's cable then the libellee's cable was on the chain at the time, if we accept Spencer's testimony, and could hardly have escaped observation. The suggestion of counsel for the claimant, both in regard to buoy 1 and buoy 2, that some unknown person may have, unknown to anyone, placed a loop with a line attached over these buoys, is so unlikely under the circumstances of this case, as to be entitled to little consideration.

Spencer's story of the course of his boat along shallow waters of the reef in which they had to get out and push the boat, is preposterous on the face of it, in view of facts developed in the course of the trial as to the location of the dredge, the Mokolii and buoy 2, and is wholly refuted by the evidence of witnesses whom there is no reason to doubt. The court cannot, in view of the character of his testimony, give any weight to his story, standing alone, of the removal of the wire from buoy 2.

With this finding, the question of the responsibility for the cable which fouled the propeller of the Siberia comes down to circumstantial evidence. The testimony which develops this relates mainly to the kind of wire cable found on the pro-

peller, shaft and shaft sleeve, and to the condition of the coil
and the position, character and condition of the clamps and
shackle, entangled in it.

A very strongly contested point in this circumstantial evi-
dence was in relation to the character of the wire cable found
on the Siberia's shaft and that used by the libellee. It is set-
tled by the introduction of Libelant's Exhibit 1, which is the
piece of wire cable taken from the propeller by the witness
Domei in Japan, that such cable was that known as right lay,
which is a cable made of strands of twisted wire, seven strands
in this case, the wires of which strands are twisted in the op-
posite direction from the direction in which the strands are
twisted. Claimant introduced considerable testimony to show
that up to some time after the day of the accident they used
for swinging lines to the dredge nothing but right and left lay
wire cable, which is a cable made of strands of twisted wires,
every other strand being twisted in opposite directions; that
is to say, holding such a piece of cable so that the strands run
upwards to the right, the wires composing every other strand
are twisted upwards to the right and those of the alternate
strands are twisted upwards to the left.

Spencer swears that the wire used on buoy 2 was right and
left lay and that they had no right lay wire on board the dredge
and did not use any other kind at that time (Spencer, p. 18),
and that all the wire that they used was most generally kept
on the dredge and on the pontoons (id. pp. 28-29), and that all
that wire which they were using at that time was wire that
was brought down on the dredge from San Francisco (id. p.
53). He admits that after November 10th, 1905, perhaps a
month later, they used right lay wire for swinging wires, say-
ing that they used "lots of it" (id. p. 45).

Captain Miller testified for the claimant that, being engaged
in the wrecking business, he did work for the dredger company
in removing obstacles and was on the dredge very often, al-
most every day during the whole of the time she was in Hono-
lulu harbor (Tr. p. 148). He testifies that he noticed the wire

which they were using because it was unusual, and that it attracted his attention and that it was right and left lay (id. p. 148); that it was open to everyone to see this because they kept their wire at a storehouse near the railroad wharf (id. p. 149). There are certain elements of weakness in Captain Miller's testimony. First, on the direct examination he was shown a piece of new right and left lay wire and asked to state the lay; he first said it was right hand lay wire. Upon being pressed by counsel he began again by the statement "that is a right hand lay wire" (id. p. 149), and, as he went on with his answer, he changed his statement and called it a right and left lay wire. His description is incorrect in that he said "the individual wires are twisted in a contrary way to which the strands are twisted, right hand, and the individual wires are twisted left hand," which is a good description of right lay wire, and then he goes on to say "that is what we call right and left hand lay wire," and a few lines further along (p. 150) he was shown Libelant's Exhibit 1 and asked what kind of lay it was and he answered "That is a right hand lay wire; the individual wires is laid the same way as the strand," which is a wrong description, as the court has stated above that in a right hand lay wire the individual wires are laid in the opposite way from the strands. Another weakness in Captain Miller's testimony is that although he states he was familiar with the use of wires by the dredge all through her work and that she used the same kind of wires as mentioned, he qualifies this remark by saying he would not want to say that she did not use others (id. p. 152). So that, if we accept Spencer's statement that after the accident perhaps a month, they used right lay wires for swinging wires and "lots of them," such use did not attract the attention of Captain Miller. Captain Miller admits his want of familiarity with right and left lay wires (id. p. 148) and his testimony must be taken as simply based on an impression which he received when his attention was directed first to right and left lay wire as being a form new to him and after that time, having no reason to notice them, he

failed to give them any particular attention and did not know when the dredge began to use right lay wire, and so if such wires were used before the 10th it would not necessarily have attracted his attention.

Matson, for the claimant, was asked on page 64 of his deposition, when the subject under consideration was the loop placed over buoy 2, "Do you remember what kind of wire it was that was used on that pennant, whether right lay or right and left lay?" He answered "I didn't notice it, I didn't look over the wire." Then on being asked "Do you know what kind of wire you were then using aboard the dredge?" he answered "Yes, sir, we were using right and left."

Now in connection with the incident already referred to— the raising of buoy 1 by the pile driver and finding a wire cable attached to its chain, we find that the witnesses who were present and who have testified to other matters connected with such cable, with the exception of Keawe, did not notice the lay of the wire. Keawe testified that he was over forty years old, a carpenter, had worked for the government nearly twenty years around the wharves, carpentering, going on scows and out to buoys, repairing of wharves and has had some experience with wires on shore and on the pile driver (Tr. pp. 340, 355). He said the wire found on buoy 1 was like Libelant's Exhibit 9 (right lay), and not like Libelant's Exhibit 10 (right and left lay) (id. p. 345), and on cross-examination, upon being asked what a right lay wire is, said "There is one kind of wire has one lay that is different from another kind of wire which you can plainly see has a double lay, one going one way and the other going the other way" (id. p. 354). Counsel for claimant has attempted to belittle this testimony of Keawe in regard to the lay of the wire found on buoy 1, speaking of Keawe as a "common laborer" (Claimant's Brief, p. 16). The evidence shows that he is a mechanic of long experience in government work, in which he has had much to do relating to the use of wire cables and general repairing work. No reason exists for throwing aside his positive testimony,

especially considering his satisfactory description ·of the differ-
ence between right lay and right and left lay wire cables.

There is another attempt by the claimant's counsel to de-
stroy the testimony of this witness and of Pololu, by trying
to show from the records of their pay rolls that they did not
and could not have been present on the occasion referred to.
To show this, the witness Morse, foreman of the wharf depart-
ment, was called by the claimant, he having been previously
sworn as a witness for the libelant, · and his time book for the
month of November was introduced in evidence. It appears
from the testimony of this witness that he was accustomed to
rather a loose practice in keeping his time book. For instance,
if a workman worked the smaller part of a day on one job and
then was transferred for the rest of the day to another job,
his pay for the smaller part of the day would sometimes be
lumped in with his pay for the rest of the day. His book
shows Keawe is credited for the 11th of November on the ac-
count of the Sorenson wharf and he says in his testimony
(p. 388), in answer to the question "Where is his pay for lift-
ing it (the buoy) up; is that on the 14th of November?"—
"Well, I don't remember exactly the day of the month; it was
a couple of hours and was a short while only and I have got him
booked down on the Sorenson wharf, charged to Sorenson's
wharf." Then the question "Is this credit to Keawe on No-
vember 14th, $2.50, does that include the lifting up of the
buoy? A. May be that was lifting up the buoy, or examining
the buoy" (Tr. p. 388). He says at the bottom of this page
and at the top of the next page that both Pololu and Keawe
were paid for the work of lifting up the buoy at the time that
Captain Fuller and others were out at the buoy. On that
page he says, "If I worked on a job a couple of hours, got
through and transferred my men to the next job, I charged it
to the last job," and repeats the statement on page 390 in the
following words: "If they worked a quarter of a day . . .
and if nothing more would be done, I would give them a quar-
ter of a day for it, and sometimes if· they have a small job and

finish it up and go to another place I would charge it on the big job." There is a credit for both Pololu and Keawe on the 13th for a day's work and the witness says, on page 393, in answer to the question "You know as a matter of fact that he did that work for the government and was paid for it?" "He did the work for the government and got pay for it. Keawe is credited to Sorenson's wharf for the 13th." It is, I think, apparent from Morse's testimony and from a reference to the book (Libelant's Exhibit O), that where a workman worked for the lesser part of a day at one place and then was transferred for the rest of the day to another place, for the work of which a separate account was kept, he would sometimes give him his full day's credit on the account for the work at the latter place. There is no testimony in the record which shakes the evidence as to the presence of both Pololu and Keawe on the occasion of the raising of buoy 1 by the pile driver, and the discovery of the wire cable on its anchor chain.

Claimant's witnesses Spencer and Matson, both of whom say they were present when the line to buoy 2 was attached by throwing a loop over the buoy, testify that the loop was made by taking a cable from seventy-five to one hundred feet long, doubling it and fixing the ends to a shackle by means of eyes either made by splicing or by clamps, to the pin of which shackle was attached the line running to the dredge (Spencer, pp. 13-14; Matson, pp. 62-63). This form of loop was shown in Claimant's Exhibit 1, filed as Libellee's Exhibit D, both witnesses approving this form of diagram. Mr. Lyle, witness for the libelant,—the diver who went out to the Siberia after she had left the harbor with her starboard propeller fouled, and who worked on it for some hours and finally detached the buoy chain which was entangled with the propeller by cutting a loop of wire cable holding this chain, both ends of which loop were entangled in a mass of cable wound tightly around the shaft or shaft sleeve or both,—testified that the piece of wire cable introduced in evidence as Libelant's Exhibit 1, which was a piece taken off the propeller shaft in Yokohama by Domei,

a diver who afterwards was a witness in this court, was like the wire coiled around the shaft, except that he says the cable on the shaft when he was working at it was new, while the exhibit was rusty (Tr. p. 70); also that the clamp introduced in evidence as Libelant's Exhibit 3 and the shackle introduced in evidence as Exhibit 2, were similar to those which he found on the cable and chain (Tr. p. 68). This wire loop was held by the chain four or five feet from the shaft. Wrapped in the wire which was around the shaft or shaft sleeve, he found embedded a shackle and two clamps so that only a small part of them was visible. It was the top part of the shackle which was visible, meaning, as I understand, the bow of the shackle, as he says it was the shoulders of both shackle and clamps that he saw (Tr. p. 68). He made no successful attempt to remove the wire cable and advised the captain that it was safe to proceed on his voyage with the wire remaining on the shaft (id. p. 69), which was done. He says that after he had cut this wire and released the chain, about four feet on one side and five or five and a half on the other were the lengths of the projecting pieces (id. pp. 69-70). He identifies the chain exhibited as Libelant's Exhibit 4 as looking like the chain which he loosed from the propeller (id. p. 70). The clamps were tarred as if new but the shackle had no tar on it and there was no marine growth on either or on the wire cable (id. p. 71). On cross-examination he swears that Exhibit 4 was a piece of the chain (id. p. 82). He says, on cross-examination, that he reported "twenty-three parts of wire around there" (id. p. 83), which I understand to mean the shaft. The aim of the defense was obviously to prove the loop found on the propeller shaft to be a short one, four or five feet long, so that it would appear unlikely that the wire cable was the cable of the dredge, as it had attempted to show that its cable was attached to the buoy by a loop made by a cable seventy-five to one hundred feet long with the ends brought together, which would make a loop of from thirty-seven to fifty feet long; which would, in the opinion of the defense, bring the clamps and shackle so far

back as not to fit the conditions which were discovered on the propeller.

I find from the evidence of Domei, the diver who removed the wire cable and afterwards testified in this case, that he found one shackle and one small clamp, although he speaks of them both as shackles (Domei, p. 15); that both of these were unattached to any wire although tightly wrapped by wire into the coils around the shaft (id. p. 24). The second clamp which Lyle says he saw was not noticed by Domei. Domei says that the cable was wrapped around the shaft twenty times (id. p. 11), and three times around the guard (id. pp. 21-22), which corresponds to Lyle's "twenty-three parts of wire around there" (Tr. p. 83). The diameter of the shaft was 19½ inches, according to Hamilton, Chief Engineer of the Siberia (Hamilton, pp. 28-29), and the diameter of the shaft with the liner 21¾ inches, and that of the shaft sleeve about 30 inches. On the most favorable calculation to the defense, the circumference of such shaft sleeve must have been over seven feet, and twenty coils would consume 140 feet at least of wire cable, and the three coils around the guard something more. So that it is perfectly safe to assume, even allowing the loop contended for by the defense as shown by Libellee's Exhibit D, that in these twenty-three coils, the whole of such loop with its clamps would be involved in the wire fouling the propeller shaft. As the shackle and the clamp were detached from any wire, it is impossible to say where they had been fastened to the wire coiled around the shaft sleeve. Domei says one section of the wire protruded about three or four feet and he cut it off (id. p. 11); also a shorter one protruded, both pieces protruding on the starboard side of the shaft and that they were about one foot apart (id. p. 12). This protruding end, which he cut off, is the piece which has been introduced in evidence as Libelant's Exhibit 1 (id. p. 15). He said that the large shackle introduced in evidence as Libelant's Exhibit 2 is the same shape and size as the one which he took from the propeller (id. p. 16). He stated that there were three turns of

the wire over the guard as well as twenty wraps around the shaft (id. pp. 21-22). Domei guessed at the length of the long wire which he took off the shaft as between thirty and fifty feet (id. p. 22). In view of the definite statement that such cable was wrapped twenty times around the shaft sleeve and three times around the guard, this guess cannot be allowed very much weight. This wire was in two pieces, the short one about six feet long and the long one. The piece which was exhibited in court was part of the long one. The small shackle entangled in the wire was opened out.

The libelant has put in testimony from the witness Morse as to the method used by libellee in fastening swinging cables to fixed objects in Honolulu harbor and introduces Libelant's Exhibit 7 (Tr. p. 105), which is a diagram showing the method by which libellee fastened its cable to an anchor on the reef, which, as the diagram plainly shows, was in the nature of a running noose. The testimony connected with the cable on buoy 1 is circumstantial but relevant in this connection. Several of the witnesses who examined this cable the day after the accident when it was pulled up by the pile driver, agreed that the loop around the anchor chain was made by doubling up the end of a wire and fastening it with clamps,—two clamps in this case,—making what the witnesses sometimes called an eye; then a shackle is placed on the end of such loop or eye and over the body of the cable, making a running noose, which was· thrown over the buoy. This testimony is illustrated by Libelant's Exhibits 12 and 13 and Libellee's Exhibits L and N. Exhibit 13, drawn by Lyle, corresponds with Libelant's Exhibit 7 testified to by Morse (Tr. p. 362), and represents a small eye made by two clamps, to the end of which is attached the shackle through which the line runs, making a noose. Exhibits L and N, made by Mr. Frank and endorsed by libelant's witnesses Pololu and Faria respectively on cross-examination, represent an eye made by bending the chain over and fastening the end to the cable by two clamps, but in this case the eye is made long and that part of the eye where the clamps are has

been drawn through the shackle so that the noose is made of a double cable around the chain, instead of the single cable as in the testimony and exhibits of Morse and Lyle.

The difference between these two sets of diagrams as to the cable attached to buoy 1 is important, inasmuch as Mr. Lyle found only one wire cable around the anchor chain of the buoy entangled in the starboard propeller of the ' Siberia (Tr. p. 66), whereas if the loop on buoy 2 was made according to the libellee's Exhibits L and N,—that is a long eye, and if the clamps making the eye had been pulled through or close to the shackle as shown by such exhibits in the case of buoy 1, then the circumstance of the wire on the propeller as Lyle found it would not correspond to such a condition, as in that case there would have been two wire cables around the anchor chain. The testimony, however, of Morse as to libelant's Exhibit 7, which illustrates a line of the dredge attached to an anchor on the reef, and Lyle's testimony as to the loop found on buoy 1, illustrated by Exhibit 13, drawn by himself (Tr. pp. 362, 367), in both of which the eye is made small and fastened by the clamps and no part of which was drawn through or close to the shackle, thus leaving but a single wire cable around the anchor in the one case and the anchor chain in the other, harmonizes with the single cable around the anchor chain fouling the propeller as found by Lyle. The Exhibits L and N were drawn by counsel for the claimant on the cross-examination of libelant's witnesses Pololu and Faria and were accepted by such witnesses (Tr. pp. 311, 324-325). Mr. Lyle drew his own diagram (Exhibit 13), which is a circumstance in favor of its accuracy and tends to outweigh a diagram made by counsel and accepted by a witness who, as in these cases, may be said to have been at a loss for words clearly to state what they wished to describe. However that may be, with the condition of the coil of wire around the propeller shaft sleeve with the shackle and both clamps separated from the wire cable by the great force of the propeller which produced the entanglement, it is not easy to lay down a specific proposition as to the kind

of loop which was used, except that it was not a loop made of a large eye which had drawn so tight that two wire cables must have been around the anchor chain. Such a loop may have been used and the clamps creating it together with the shackle may have been caught in the coil before a sufficient strain was put on the wire cable to pull the noose tight; or it may be, which is more likely, that the loop was according to the description of the witnesses Morse and Lyle, shown by Libelant's Exhibits 7 and 13, with a small eye, and that the shackle and clamps became entangled in the coil before there had been strain enough to cause it to slide along the wire into a close loop around the anchor chain. If such is the case, and the loop was about six feet in length, that would produce the condition found by Domei in which there was a piece of wire protruding three or four feet, which he cut off, being a piece of the long wire, and a shorter one protruding about one foot, the shorter one being found to be about six feet long when he removed it (Domei, p. 23). Either of these theories accounts reasonably for the condition of the coil as found by Lyle and Domei. It is more difficult to account for the condition of the coil on the theory of the loop described by Spencer and Matson, for, although the coil was long enough to take up the whole of such loop,—which would be from thirty-seven to fifty feet long,—yet the fact of a short end being found in the coil, strongly tends to support the theory of the kind of loops already referred to and delineated in Libelant's Exhibits 7 and 13.

An attempt was made by the defense to show that the pin of the shackle used by the libellee in making the loop in question was held in place by a nut screwed on to the end of the pin, instead of by a key, which is a piece of soft iron passed through an aperture in the end of the pin, and bent to one side, or is a pin with a split end which is opened out when the pin is put through the shackle, thus holding it fast (Tr. pp. 223, 228). Spencer says (p. 14) that he believes the pin was fastened in the shackle by a nut screwed up and Matson corroborates this. This testimony, if accepted, tends to strengthen the defense

somewhat, as obviously the pin of the shackle would be more easily displaced by the strain of the fouling of the propeller if fastened with a key than if fastened by a nut; but the court has nothing before it by which it can gauge the power of the terrific strain put on the tangled mass of wire cable and anchor chain, and it moreover appears that the clamp which was found in the wrap by Domei (p. 24) had been disconnected from the cable although it had been fastened to it, if at all, by two nuts, and had also been opened out. The court, as elsewhere suggested, is unable to rely to any great extent upon the statements of Spencer, and entertains also some want of confidence in Matson's testimony, yet, if their testimony on this point should be accepted, the conclusion of the court on the main issue would not thereby be affected.

The evidence is preponderating under all the circumstances in favor of the contention that the wire which fouled the Siberia's propeller was the wire of the libellee. The argument of counsel for the claimant that someone else may have attached a wire to the buoy exactly like the wire of the dredge, with clamps and shackle exactly like those in use by the dredge, without anyone knowing it, is too remote a supposition to have weight in this case, especially as none of the witnesses were aware that any parties beside the libellee had ever used the method of attaching wire cables to buoys in the Honolulu harbor, by throwing a loop of such cable over a buoy.

Under the foregoing analysis of the evidence, I make the following findings:

I have already placed the burden of proof as to the removal of the wire cable of the libellee from buoy 2 before November 10th, 1905, on the claimant and find that such removal has not been shown, but the preponderance of evidence favors the proposition that it was not removed. I find that the wire cable found on the anchor chain of buoy 1, on the 11th of November, as testified to, was the cable of the libellee and that the wire of that cable was right lay wire; and, as a result of such finding that the claimant has failed to prove that it did not use

any wire for swinging lines before the 10th of November except right and left lay. I find that the wire cable fouling the starboard propeller of the Siberia was the wire cable of the libellee and used by it as a swinging line for working the dredge and attached by it, as admitted, to such buoy several days before the 10th of November, and left by it on such buoy until the time of the accident.

These findings bring up the question of negligence for the consideration of the court. In its decision on exceptions in this case, the court cited the case of *Inland & Seaboard Coasting Co. v. The Commodore,* 40 Fed. Rep. 258, in which case a dredge had left an anchor used in mooring it at the bottom of the harbor and another vessel had fouled it and thereby received damage. The court said: "The tort is the tort of the dredge; the negligence which caused the tort is the negligence of the dredge."

The authorities on this question of negligence are harmonious on the rule that where an anchor, a telegraph line or a mooring cable is left on the bottom of navigable waters used by ships in such a way that a ship moving in such waters, with a draft which is not too great for its movement, without touching bottom, is fouled by such a cable, telegraph line or anchor, it is negligence on the part of those placing it in such a position. In this case a charge is made that the libellee cast off its swinging line and caused the end of the section thereof connected with the buoy in question to drop to the bottom of the harbor and left it there, in which position it fouled the starboard propeller of the Siberia. By the authorities it would appear that the negligence would have been the same if the cable had fouled the propeller of the Siberia under similar circumstances, when it was attached to the dredge and was being used by it, although it is admitted that the dredging operations were legal and under authority, the point being that it is negligence for such cable to be so located that it can foul or damage a vessel properly navigating such waters.

In the case of *Western Union Telegraph Co. v. Inman & I Steamship Co.,* 59 Fed. Rep. 365, 367, the court said:

" It being clear that the steamer was navigating, it is for the owner of the cables to show that they were not so maintained as to obstruct navigation."

The syllabus in this case contains the following:

"A vessel which, though touching bottom, forces her way by her own screw through the soft mud, is 'navigating'; and if, while so doing, her screw is fouled by, and breaks, a submarine cable, the burden is on the cable company to show that the cable was so constructed and maintained as 'not to obstruct navigation' as required by Rev. St. 5263; and this burden is not sustained when there is nothing to show the actual condition of the cable at the time, and it appears that it was originally laid near the end of an existing pier used by large ocean steamers, and over a mud bank, which they must necessarily plow through at certain states of the tide."

Section 5263 of the Revised Statutes gives permission to telegraph companies to lay and operate telegraph lines "over, under or across the navigable streams or waters of the United States; but such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters."

The case of *Blanchard v. Western Union Telegraph Co.,* 60 N. Y. 510, says (p. 515):

" Navigation is injuriously interrupted when the channel of the river is made less safe, and ships and vessels are hindered, delayed or injured. Telegraph cables so laid or suspended in the water as to catch upon the keels, or come in contact with vessels navigating the stream, with such draught as the depth of water will permit, and which, but for such cables, would pass without difficulty or interruption, are improperly placed, and do injuriously interrupt navigation. . . . A *prima facie* case was made against the defendant when the plaintiffs proved that the steamer, adapted, in all respects to the navigation of the river, and which had for years, and in safety, passed over this part of the stream almost daily, and

requiring less depth of water than other vessels passing over at the same point without grounding, had come in contact with the defendant's cable and received injury. The very fact of a collision and consequent injury unexplained, authorized the finding that the defendant had, by its cables, unlawfully obstructed the navigation of the river, and caused the damage."

Numerous other decisions support such rule of negligence.

The defense in this case has tried to show, through the evidence of Matson and Spencer, the former of whom fixed the position of the buoy in shallow water on the reef (Matson, p. 64), and the latter, who described the approach to the buoy in proceeding toward it in order to attach their swinging line to it, as through shallow water in which they had to get out and wade and push their boat (Spencer, p. 16), in which testimony he was supported, though less circumstantially, by Matson, to show that the Siberia was guilty of negligence in backing into shallow water. This evidence, as has been shown above, is not worthy of credence, being wholly disproved by preponderating and reliable evidence to the contrary. The Siberia drew twenty-eight feet in its usual maneuver before leaving the harbor, backing to a position approaching buoy 2, which was of sufficient depth for its movement, and was fouled by this cable at a considerable distance from the buoy itself, which, in its proper position, was in twenty-four feet of water but had been moved out of such position obviously by the strain placed upon it by such cable when attached to the dredge.

The evidence does not show negligence on the part of the Siberia in its maneuver before leaving the harbor. The attempt to show that there was no officer on the stern of the ship during such maneuver failed, the witnesses who did not see such officer being overborne by other witnesses who did see him, and one of whom not only saw him but shouted and signalled to him in relation to the movement of buoy 2 toward the stern of the Siberia (Tr. pp. 327-328), showing that such fouling had taken place. I find that the fouling was due to the negligence of the libellee in placing its cable where it obstructed the

navigation of the harbor by fouling with the propeller of the Siberia.

The discussion of the question of a float on the end of the section of the line attached to buoy 2, as stated by Captain Nelson, is unimportant in this connection. The only evidence on this point is that it was the custom of the libellee to attach such buoy, there being no special evidence that such was done in this case. Such buoys were handy pieces of wood and were for the purpose of floating the rope attached to the sunken cable by which the libellee might find such rope and recover such line. Such floats from the nature of the case would be inconspicuous at a distance and there is no evidence that they were placed there for the sake of a warning to ships.

In regard to the question of damages, it appears that the Siberia, immediately on fouling with the cable attached to buoy 2, proceeded out of the harbor by means of her port propeller and with the assistance of the steam tug Fearless, to an anchorage in the roadstead outside of such harbor, where she anchored and thereupon sent for a diver who, after some seven hours' work, succeeded in removing the chain of the buoy from her starboard propeller, in which work he had to cut a loop of the wire cable which held such chain, the rest of the cable being wrapped tightly around the propeller shaft sleeve; that, thereupon, under the advice of the diver and with the ends of the wire cable so severed protruding, the ship proceeded on her voyage to Yokohama; that on the examination of the ship in dry dock in San Francisco after the completion of such voyage, bits of wire obviously from the wire cable, part of which was wrapped around the propeller shaft sleeve, had become involved in the bearings of the shaft and had entered such bearings so that they were embedded therein, being found in the lignum-vitae wood forming a part of such bearings, and that, in such position, these pieces of wire, from the revolutions of the shaft during the voyage had caused damage to the lignum-vitae and to the shaft itself, so that the shaft subsided slightly in its bearings, causing a diminution of power. It

also appears that the propeller blades, as seen by the diver in Yokohama (Domei, p. 35), and the witnesses who examined the vessel in dry dock in San Francisco (Watson, pp. 8-9; Evers, p. 23; Stewart, p. 95; Gardner, p. 129), had received injuries on their edges; that such injuries were on their forward edges, all of them being affected but one more than the other two. The witness Lyle stated that while he was at work removing the chain from the propeller, he examined the upper blade and found nothing the matter with it (Tr. p. 76). From the evidence it would appear that these injuries were caused partly by the entanglement of the propeller with the anchor chain of the buoy, as pieces were taken out of the edge, which must have been caused, as witnesses Evers and Domei both testified, by striking a hard object. These injuries reached as far as four feet from the hub of the propeller (Evers, p. 37); other injuries, reaching about eighteen inches from the hub, which the witness Stewart speaks of as follows,—" I found that the leading edges of the three propeller blades were chafed and flattened off" (Stewart, p. 95), would appear to have been caused by the longer of the two protruding ends of the cable left after the loop had been severed by the diver in Honolulu, which would be struck by the propeller in its revolutions.

The question arises whether it was necessary for the Siberia to proceed outside of the harbor and anchor in a seaway at the time of the accident. The fee for the diver's services on that occasion was one thousand dollars (Tr. pp. 73, 360). His testimony is that his ordinary charge for work in still water is forty dollars a day (id. p. 368). It is evident that he was justified in charging much more than the latter amount for his services in the open sea where there was a wave movement affecting and interfering with his work and probably some movement of the vessel. The harbor of Honolulu is enclosed between the land and the reef and is ordinarily perfectly smooth, except as to the ripples caused by the wind within this area. No necessity appears in the testimony for the movement which took place to the outside of the harbor. It was not an emergency

under difficult and dangerous circumstances which would excuse a master or a pilot from ordinary cool judgment. The ship was within a few hundred feet from the city wharves and might have been taken there either by warping or the assistance of the tug, or both, in which case it seems obvious that the work done by the diver could have been done, the water being still, at his usual charge, and it appears to the court that the libelant is not entitled to charge for the special cost of such services which were unnecessarily made outside of the harbor. The seven hours' work done would, so far as the evidence goes, represent a day's work; being done in the night time may have entitled the diver to extra pay, though there is no evidence before the court on this point. It would seem that if the libellee is charged forty dollars for these services neither party would have any reason to complain.

This ruling as to the unnecessary action of the Siberia in leaving the harbor affects also its responsibility for such injuries as may have resulted by its continuance of the voyage without removing the wire coil from the propeller shaft. It is clear that this might have been done without delaying the ship more than two or three days, if she had remained in the harbor. She took the responsibility of going on without this, and with a protruding end of the coil of wire interfering with the revolutions of the propeller, which, the evidence shows, caused some injury. She is therefore liable for such injury.

" Therefore, if it be true that plaintiff, by negligence on his part, did increase the amount of damage and injury he received, then for that additional damage he cannot hold the company responsible, though they might be responsible for the first accident, and for the injury directly caused by it." *Secord v. St. Paul M. & M. Ry. Co.,* 18 Fed. Rep. 221, 226; *Wilmot v. Howard,* 39 Vt. 447; *Shearman & Redfield on Negligence,* Sec. 32, and cases cited in notes; *Wharton on Negligence,* Sec. 868 et seq. and cases cited in notes; *Stebbins v. R. R. Co.,* 54 Vt. 173; *Sherman v. Fall River Iron Works Co.,* 84 Mass. 524, 526.

It is contended by counsel for the claimant that the damage to the blades of the propeller was entirely caused on the trip from Honolulu to Yokohama by the projecting ends of the wire cable, which had been severed by the diver in Honolulu and left projecting, which were struck by the blades at every revolution. As intimated above, I am not able to find that this cause was responsible for more than the injuries which were found within about eighteen inches of the hub. Those beyond the eighteen inches, in which the edges of the blades were broken or toothed were apparently caused by the propeller's striking the chain at the time of the fouling, or it may be by wrapping it around the blades with great force.

In addition to these were the injuries to the nuts fastening the propeller, and to what is called the propeller gland, which, in all probability, were caused both by the heavy strain of the chain or wire cable or both at the time of the fouling, and also by the revolutions of the propeller causing friction with the protruding ends of the wire cable. It is not possible to segregate exactly the injuries to the propeller blades, to the nuts for fastening them to the hub, which had to be renewed, and to the packing gland on the forward side of the propeller hub, which also had to be renewed, which were caused at the time of the fouling, from those caused on the voyage from Honolulu to Yokohama by the loose ends of the wire cable as testified to. I can do no better, under the evidence, than to attribute one-half of such injuries to each of the said causes respectively, according to the rule of damages in admiralty, and so find. *The Serapis,* 49 Fed. Rep. 393, 397-398.

The claim is made by the defense that the other injuries which resulted to the Siberia after leaving Honolulu, in relation to the fouling of her propeller, were not the direct result of the fouling but of an intervening cause, to wit: the continuance of the voyage to the Orient and back to San Francisco; and cites *Scheffer v. R. R. Co.,* 105 U. S. 249; *Goodlander Mill Co. v. Standard Oil Co.,* 63 Fed. Rep. 400, and *Jenks v. Wilbraham,* 77 Mass. 142, in support of its contention. So

far as the continuance of the voyage from Honolulu to Yokohama is concerned, the point is not well taken, inasmuch as there are no facilities at Honolulu by means of which the injuries could have been examined and repaired. The Siberia was justified in proceeding with her freight and passengers to the next port on her schedule, and that was the course most favorable to the libellee in the matter of damages, as the other possible course,—her return to San Francisco for dockage and repairs, would have involved expenses in relation to conveyance of the mails, passengers and freight to their destination by another vessel, with the probable delays incident to such an enterprise, which must inevitably have been far beyond the comparatively minor expenses caused by her own continuance of the voyage. The negligence of the libellee was the efficient cause of all injuries resulting from the fouling, including those which necessarily occurred by reason of the continuance of the voyage, so far, at least, as to be within reach of dockage facilities, and it is liable therefor, except the damage caused by the loose ends of the wire cable, which might have been removed in Honolulu.

At this point the question arises as to the liability of the libellee for such injuries as were caused on the return trip from the Orient to San Francisco, for it appears by the testimony of Mr. Beaton, on cross-examination, who was the superintendent of the San Francisco dry-dock, that he thinks there were facilities for dry-docking in China or Japan and that the Siberia had been dry-docked there on a former trip. He is not sure about this, but says, "I think there are, but I don't know. I am pretty sure she was on there. Certainly I don't know, but that is my impression" (Beaton, p. 125). Neither side carried this point further. The above testimony is, to my mind, hardly definite enough to justify the court in holding the libelant to the responsibility for such injuries as may have resulted from the continuance of the voyage to San Francisco without going into dry dock in "China or Japan."

Considerable evidence was drawn out concerning the necessity of docking the Siberia upon the completion of her voyage. It is perfectly clear to me that it was necessary, the information in the possession of the company in regard to the accident, the work of the divers in Honolulu and Yokohama and the diminished speed of the propeller, was sufficient to justify the placing of the ship in dry dock for investigation, and in order to do what such investigation might show to be necessary. Stewart testifies (p. 97) that if all the wire had been removed from the shaft in Honolulu he should still have recommended dry docking. The injuries found justified such action and there is no evidence to show that she was retained in dry dock longer than was necessary. The repainting of the hull, which was proved to be necessary in order to protect the antifouling paint already on from injury because of exposure to the air, did not extend its continuance in the dry dock.

Although the libel does not specifically refer to the expenses of the repainting as a basis for damages, it might be regarded as within the general allegation of injuries caused by the negligence of the libellee. It certainly was necessary to prevent injury in the dry dock. Libelant's answer to the first interrogatory of the amended answer asking for the items making up the damages prayed for, contains no reference to a claim for repainting. Testimony was however introduced by libelant, without opposition, showing the expenses of such repainting, aggregating about $1350. According to the testimony of Railton,—the libelant's auditor, the Siberia was customarily docked for cleaning and painting every fourth voyage; and according to Hamilton, Chief Engineer of the Siberia, she was usually docked every third voyage, and this was her thirteenth voyage and she had not been docked since her tenth voyage. In view of this evidence I do not find that the repainting is an equitable charge against the libellee. It may be that the Siberia would have been docked at that time in the regular course of things for cleaning and painting, if the other cause for docking had not arisen. Such action was due either then

or at the end of the next voyage. The necessity of painting, which developed, was equally an opportunity, as the Siberia thereby escaped the usual dockage charges which would range from $2,256.80 to $4,513.60. This point suggests a wide field of conjecture; for instance to take one proposition, if the evidence had shown that the Siberia would have drydocked at such time for painting, would libelant be entitled to dockage fees for more than the surplus time for repairs?

The above finding, charging libelant with one-half of the expenses relating to the injuries to propeller blades, to the nuts fastening them to the hub, and to the packing gland forward of the hub, raises the question whether the libelant should be held responsible for a part of the dockage fees and the demurrage on this account. I am of the opinion that it should be so held as a part of the results of its negligence. The case of *The Max Morris,* 137 U. S. 14, 15, leaves the question open as to whether in such a case the decree should be for one-half or for a different proportion of the damages sustained. To award a proportion in accordance with the facts, which might be more or less than one-half, would seem to conform to justice and to an intelligent consideration of the ethics of such a question.

"The difficulty of separating the damage from each independent cause may be great, but it does not change the nature of the tortious act of the defendant or relieve him from liability; *Little Schuylkill Nav. Co. v. Richard's Adm'r.,* 7 P. F. Smith, 146-147; *Seely v. Alden,* 11 Id. 302." *Gould v. McKenna,* 86 Pa. St. 297, 303.

"And whenever the injury produced by the plaintiff's negligence is capable of a distinct separation and apportionment from that produced by the defendant, such an apportionment must be made, and the defendant held liable only for such a part of the total damage as his negligence produced." *Beach, Contributory Negligence* (3rd ed.) Sec. 69, p. 109.

It is fortunate that in this case a copy of the bill for the repairs made to the Siberia in dry dock of injuries which were

the result of the fouling, is a part of the record, as Libelant's Exhibit 6. This bill, which is in considerable detail, shows the number of hours expended in repairing the injuries for which the libelant is found to be partially responsible, to be a little over one-fifth, or 22%, of the number of hours charged in making the total repairs. With this showing, I find that the libelant should be held responsible for 11% of the dockage fees and 11% of the proper charge for delay in San Francisco.

The following is the bill of particulars furnished by libelant in answer to claimant's first interrogatory:

" a. Machinery Repairs on 'Siberia'..........$ 3,442.09
  b. Surveys of 'Siberia' and Reports thereon..      200.00
  c. Drydocking of 'Siberia' during time alleged
       in libel .........................  15,932.60
  d. Services of Diver and his Apparatus in
       Honolulu .........................   1,000.00
  e. Services of Divers in Japan ............     125.00
  f. Delay of 'Siberia" in Honolulu..........     300.00
  g. Delay of 'Siberia' in San Francisco.......   4,000.00
                                         _____
       Total ........................ $24,999.69 "

In accordance with the evidence and the above findings, this claim is modified as follows:—The cost of repairs to the propeller blades, propeller hub and propeller gland, as shown by divisions 1, 2, 10, 11, 12, 13 and 14 of Libelant's Exhibit 6, is $869.46. The item for total repairs,—$3442.09,—is therefore diminished by one-half of $869.46, which is $434.73, leaving $3007.36 as the amount to be allowed for repairs.

The charge of $15,932.00 for dry docking, which is based on charges of 20 cents a ton for day time and 10 cents a ton for night time: the tonnage of the Siberia being 11,284, and $1.50 an hour for 18 hours' use of the air compressor, $1.50 an hour for 72 hours' use of the steam capstan, is diminished by 11% of that amount, which is $1,752.59, leaving $14,180.01 as the amount to be allowed for dockage.

The item for services of diver in Honolulu, of $1,000, is reduced to $40.00.

The item of $300 for seven hours' delay of Siberia in Honolulu is reduced to $250.45, in accordance with the finding on the next item.

The item of $4,000 for delay in San Francisco is reduced to $3,434.75, it being shown that her average net earnings for her previous twelve voyages was $858.68¾ a day, and that she had been delayed in starting on her next voyage after the docking and because of it, four days; and further reduced by $377.82, 11% of that amount, leaving $3,056.93.

The claim of libelant by items, as modified and allowed by the court, is as follows:—

a.  Machinery Repairs on Siberia ............... $ 3,007.36
b.  Surveys of Siberia and Reports thereon ......   200.00
c.  Drydocking of Siberia ....................  14,180.01
d.  Services of Diver in Honolulu .............      40.00
e.  Services of Diver in Japan ................     125.00
f.  Delay of Siberia in Honolulu .............      250.45
g.  Delay of Siberia in San Francisco .........    3,056.93

        Total ......................... $20,859.75

A decree will be signed for this amount in favor of the libelant, with interest from March 12th, 1906, the date of the amendment of the libel on exceptions, with costs, except those accruing on the exceptions to the libel and on libelant's motion to amend the libel.

*Modified on appeal*: See *North American Dredging Co. v. Pacific Mail S. S. Co.*, 185 Fed. 698.